UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CERRIDWEN AURANDT, on behalf of herself and all others similarly situated,

Plaintiff,

v.

RANGE VIEW MANAGEMENT, LLC, d/b/a LENDVIA, BETTER DEBT SOLUTIONS, LLC, and DOES 1-10,

Defendants.

CASE NO. CV25-5785-BHS

ORDER

THIS MATTER is before the Court on plaintiff Cerridwen Aurandt's motion for partial summary judgment, Dkt. 34, defendants Range View Management, LLC, and Better Debt Solutions, LLC's renewed motion to compel arbitration, Dkt. 37, and Defendants' renewed motion to stay discovery, Dkt. 41.

This is a putative class action. Aurandt alleges that for years she has received unwanted loan solicitation phone calls from Defendants. She brings claims for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA), Washington Telephone Solicitation Act, RCW 80.36 *et seq*. (TSA), and the Washington Consumer

ORDER - 1

Protection Act, RCW 19.86 *et seq*. (CPA). She seeks class certification, statutory damages, treble damages, costs and attorney fees, and injunctive relief.

Defendants argue that Aurandt must arbitrate her claims. They assert that on January 12, 2025, at 9:06 am, Aurandt completed a three-step "clickwrap" agreement at Lendvia.com, through which she expressly consented to receive telemarketing phone calls and to binding arbitration. Defendants rely on a screen recording created by the company Verified Consent that purports to show Aurandt entering her name, phone number, address, and social security number on Lendvia's website and clicking her consent to arbitrate.

Aurandt challenges the recording and disputes that she visited Lendvia's website, completed the three step clickwrap agreement, or agreed to arbitration. She contends that Verified Consent is "nothing more than a platform designed to manufacture fraudulent records." Dkt. 22 at 12. She asks the Court to grant partial summary judgment on the fact that she neither opted in to receive telemarketing solicitations nor agreed to arbitrate her claims. Dkt. 34 at 9.

ORDER - 2

## I.   BACKGROUND

**A.      Loan Application Process, Clickwrap Agreement, and Verified Consent**

Defendants are financial services companies that market and offer personal loans through websites such as Lendvia.com. Dkt. 15 at 1–2. To apply, online applicants must complete a three-step clickwrap agreement. Dkt. 16 at 3–4. In Step 1, applicants select the loan amount and purpose for the loan and then click "Continue." Dkt. 16 at 4. In Step 2, applicants enter their contact information, including their name, address, email address, and social security number. By clicking "Continue," the applicant acknowledges, agrees and consents to the "Terms of Use which includes binding arbitration." *Id.* at 5.

In Step 3, applicants must enter their phone number and check a box confirming that they "acknowledge, agree and consent to the Privacy Policy and Terms of Use which includes binding arbitration." *Id.* at 6. They also provide "express written consent for

ORDER - 3

Lendvia to contact [them] by, calls and/or text . . . even if [the] telephone number is currently listed on any state or federal Do-Not-Call list." *Id.*

The Privacy Policy and Terms of Use are included in the disclosure as hyperlinks. The Terms of Use document contains a section titled, "Arbitration Agreement and Class Action Waiver," which provides in relevant part:

> THESE TERMS PROVIDE THAT ALL DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY BINDING ARBITRATION. YOU GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS. YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS. YOUR RIGHTS WILL BE DETERMINED BY NEUTRAL ARBITRATORS AND NOT A JUDGE OR JURY.

*Id.* at 7. The Arbitration Agreement also provides that an "arbitrator will decide whether the claim or dispute can be arbitrated." *Id.*

ORDER - 4

Defendants assert that for each user who completes the clickwrap agreement, Verified Consent initiates a screen recording of the user's activity and keeps a record of each form completed and submitted. Dkt. 16 at 9; *see* Dkt. 28 at 4. Verified Consent also produces a certificate of authenticity with information about the user's interaction with the website, including the date and time of the visit, the website viewed, the user's IP address, screen size, operating system, and web browser. *Id*; *see* Dkts. 16-2, 16-3. Defendants refer to the certificate and the screen recording collectively as "Verified Consent." *Id.* Defendants argue that this combined record establishes that "(1) the user completed the clickwrap agreement on the Website, and (2) Defendants have received the user's consent prior to contacting the user." *Id.* at 8.

**B.     Procedural History**

In August 2025, Aurandt sued Defendants in Kitsap County Superior Court, alleging that she received unwanted solicitation phone calls from Defendants in violation of both federal and state telephone consumer protection laws, including the TCPA and Washington's TSA and CPA. Dkt. 1-2 at 5.

Defendants removed the case to this Court and moved to compel arbitration and to stay discovery, arguing that Aurandt consented to arbitrate her claims. For support, they attached Verified Consent's authentication certificate and the screen recording of Aurandt allegedly clicking her agreement to the terms of use and arbitration. Defendants argued that without this Verified Consent record, Lendvia never would have called or otherwise contacted her.

Aurandt responded that the screen recording contains multiple errors that suggest the record is fraudulent, including an incorrect home address[1] and an IP address that did not match her cell phone. She challenged the credibility of the Verified Consent company, pointing out the absence of contact information on its website, broken webpages, and a nonfunctioning sign-in button. She reasoned that if the company "can't keep its own website operational, how can a court trust [its] 'verification' of anything." Dkt. 22 at 5.

Aurandt also identified similar lawsuits against Defendants nationwide in which Defendants relied on Verified Consent records containing questionable data, including "non-existent screen resolutions and a suspiciously narrow range of IP addresses." *Id.* at 6. She asked the Court to deny Defendants' motion or to grant her a period of limited discovery on the issue of Aurandt's consent to arbitrate. *Id.* at 12.

In January 2026, the Court granted Aurandt's discovery request and directed the parties "to conduct limited discovery concerning the validity and enforceability of the proposed arbitration agreement." Dkt. 29 at 2. The parties exchanged interrogatories and requests for production. Aurandt requested more information about Verified Consent. In response, Defendants provided the company's home office address in the United Kingdom, along with the names and email addresses of two individuals identified as company officers, Kashif Ali and Rounak Adhikary. Dkt. 49 at 3; *see* Dkt. 51-1 at 4.

---

[1] Aurandt asserts that the address was entered incorrectly because it omits "NE" and capitalizes "PL," which she "always" lowercases. Dkt. 23 at 2.

ORDER - 6

Aurandt also hired an expert, Markel Samuel, to provide a forensic analysis of her cell phone. Samuel concluded that "the technical record as presented does not provide a reliable basis to conclude that [Aurandt] personally accessed [Lendvia] or assented to the terms at the alleged time." Samuel Decl., Dkt. 35 at 9. He signed his expert declaration February 17, 2026. Aurandt did not file the declaration until April 14, 2026, after the limited discovery period concluded on April 9, 2026.[2]

In March 2026, Aurandt hired a private investigator Andrew Cooper to gather more information about Verified Consent. Cooper determined that the company's UK business address is a virtual office service used by approximately 85,000 companies and that the company did not maintain a physical presence at that location. Dkt. 50 at 2. He found no evidence that the company is registered in the UK or that the individuals identified by Defendants as company officers appeared to have any documents corroborating that relationship. *Id.* at 23.

---

[2] Defendants move to strike Samuel's expert declaration as untimely under Rule 37(c). Dkt. 37 at 4–5. They argue that Aurandt's failure to promptly disclose the declaration prevented them from conducting discovery to rebut Samuel's opinions. *Id.* at 5. They request leave to conduct discovery regarding the expert's qualifications and opinions. *Id.*

Aurandt responds that she waited to file Samuel's declaration until after she retained her T-Mobile cellular records. She contends that any failure by Defendants in conducting discovery was not caused by her and that nothing prevented Defendants from retaining their own qualified expert to perform a forensic analysis of her phone.

The Court agrees with Aurandt that Defendants were not prejudiced by the five-day late disclosure. Defendants were able to respond to Samuel's testimony in their reply brief and relied on the testimony of Vice President Webb to rebut Samuel's conclusions. Moreover, Defendants had the opportunity to examine Aurandt's phone during the limited discovery period but chose not to do so. Defendants' motion to strike is DENIED.

ORDER - 7

Defendants likewise requested discovery, including all documents related to Aurandt's contention that the arbitration clause was unenforceable, and all documents related to her contention that she did not visit, access, or use the website. Dkt. 38-2 at 6. In response, Aurandt identified her previously disclosed declaration stating that she did not visit the website along with a screenshot from a separate website, Databreach, purporting to show that her data had been breached by multiple companies. Dkt. 37 at 8; *see* Dkt. 38-2 at 4–5. She produced no other documents in response to Defendants' request. Dkt. 37 at 4. Defendants did not depose Aurandt and did not request to examine Aurandt's phone.

Defendants now renew their motion to compel arbitration and their motion to stay, asserting that the evidence "overwhelmingly demonstrates that [Aurandt] entered into an arbitration agreement." Dkt. 37 at 2–3. They rely on Verified Consent's certificate and screen recording, Dkts. 18, 19; two declarations from Defendants' Vice President of Business Strategy, Chase Webb, Dkt. 18, 39; two declarations from Defendants' Chief Technology Officer, Kash Izadseta, Dkt. 27, 40; and a declaration from the Chief Technology Officer of Verified Consent, Adhikary, Dkt. 28-1. They contend that Aurandt fails to provide any corroborating evidence that she did not sign the agreement.

Aurandt moves for partial summary judgment on the question of whether she consented to arbitrate. She contends that there is no "credible evidence that [she] opted in to receive telemarketing solicitations from the Defendants or agreed to arbitrate her claims." Dkt. 34 at 9. She moves to strike all evidence produced by Verified Consent and the declarations from Webb and Izadseta. She contends that the testimony of her own

expert, Samuel, proves as a matter of law that she never visited Lendvia's website, never agreed to arbitrate her claims, and never consented to Defendants sending her telemarketing communications. Dkt. 49 at 14.

The Court first addresses Aurandt's evidentiary objections and then turns to the question of arbitrability.

## II.  DISCUSSION

### A.    Evidentiary Objections

#### 1.    The Verified Consent Record, Exhibits B & C

Aurandt moves to strike all evidence produced by Verified Consent under Federal Rule of Evidence 901, asserting that Defendants have failed to lay an adequate "foundation" for the records. She contends that Defendants have provided "[n]o chain of custody testimony, no embedded digital signatures linking it to the Plaintiff and her device, and no testimony as to the system's reliability or even how it works." Dkt. 22 at 3. She also asserts that "Verified Consent is not a legitimate company and this Court should not trust anything that it purports to touch." Dkt. 49 at 7. She moves to strike any references to the recording as a "video." Dkt. 22 at 2; Dkt. 49 at 7.

Defendants argue that the Verified Consent record is a self-authenticating business record. They submit a declaration from Verified Consent's Chief Technology Officer Rounak Adhikary, who describes the process used to create the recording:

> The recording process is triggered automatically when the user begins filling out the online form and concludes upon the completion and submission of the form. Verified Consent maintains a recording of each form completed and submitted. If a user does not complete and submit a form, any information provided by the user is not maintained. When a user has

> completed the online form and submitted it, a Certificate of Authenticity is generated, which is referred to as a 'Verified Consent.'
>
> ***
>
> I can testify to the identity and method of preparation of the records and documents. I personally reviewed the documents referred to herein. Exhibits B and C attached to the Declaration of Chase Webb are true and accurate copies of the Verified Consent and video recording that were captured by Verified Consent's software and maintained by Verified Consent in its usual course of business.

Dkt. 28 at 5. Aurandt does not move to strike Adhikary's declaration and it is unclear from the record whether she attempted to depose him. At this stage, Adhikary's declaration is sufficient to create a question of fact as to the authenticity and reliability of the Verified Consent records. Aurandt's motion to strike any reference to the record or video is DENIED.

### 2. Declarations of Vice President Webb

Defendants submit two declarations from Vice President of Business Strategy Webb describing the process to apply and obtain Defendants' financial services. Webb explains that to complete a loan application, consumers are *not* required to download an application, create an account, or receive a confirmation email. Webb Decl., Dkt. 40. He disputes Samuel's conclusion that the clickwrap agreement would "necessarily leave multiple forms of persistent forensic evidence across applications," explaining that the absence of digital evidence is consistent with the application process. *Id.*; *see* Samuel Decl., Dkt. 35 at 6.

Aurandt moves to strike, arguing that Webb never examined Aurandt's phone and therefore has "no idea if [her] cell phone requires her to install an application to engage in the 'three-step process.'" Dkt. 49 at 3.

Defendants responds that Webb is not testifying as an expert but rather as a layperson testifying about "his personal knowledge of Defendants' day-to-day operations and business processes." Dkt. 56 at 6.

The Court agrees with Defendants. Webb may testify about what he knows from his role as Vice President. Aurandt may challenge the basis of that knowledge through discovery and at trial. Aurandt's motion to strike Webb's declarations is DENIED.

### 3.    Declarations of expert Chief of Technology Izadseta

Defendants submit two declarations from Chief Technology Officer, Kash Izadseta, explaining that (1) cellular phones use "dynamic" IP addresses that change frequently, Dkt. 27, and (2) a reported screen resolution of 720 x 1280 is possible for the type of cellular device that Aurandt uses, Dkt. 40.

Aurandt moves to strike these declarations under FRE 702, arguing that Izadseta's qualifications—a degree in computer science and ten years of work experience—do not establish that he is qualified to opine on IP addresses or screen resolutions. Dkt. 49 at 1–2. She also argues that Izadseta fails to explain the principles and methods used to reach his conclusions. *Id.* at 2. She asserts that "[i]t's simply not reliable testimony." *Id.*

Defendants respond that Izadseta has formal training and work experience with the subjects at issue. Dkt. 56 at 4. They contend that examination of Aurandt's cell phone is

not required to opine on these subjects and that he can testify generally about the way cellular devices utilize IP addresses and screen resolutions. *Id.*

The Court agrees with Defendants. For expert testimony to be admissible under Rule 702, it must satisfy three basic requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3) the testimony must be relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589-91 (1993). Izadseta does not need to examine Aurandt's cell phone to describe generally the characteristics of cellular networks and the use of dynamic IP addresses. Nor does he need to examine her phone to conclude that it is possible for a phone of that type to produce a screen resolution that matches the Verified Consent record. Aurandt does not dispute these conclusions, only his qualifications and method. Moreover, the safeguards provided for in *Daubert* are "not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *see also United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (In the context of a bench trial, "there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

Aurandt's motion to strike Izadseta's declarations is DENIED.

**B.    Arbitrability**

The Federal Arbitration Act ("FAA") makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration agreements are on an "equal footing with other contracts," and therefore, a court must "enforce them according to

ORDER - 12

their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation modified). Before compelling arbitration, a court must determine two gateway issues: "'(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Johnson v. Walmart Inc*., 57 F.4th 677, 680 (9th Cir. 2023) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000)). The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

When the making of an arbitration agreement is disputed, courts apply the summary judgment standard. *Hansen v. LMB Mortgage Servs*., Inc., 1 F.4th 667, 670 (9th Cir. 2021); *see* Fed. R. Civ. Pro. 56. A court may compel arbitration only if, viewing the evidence in the light most favorable to the party opposing arbitration, no genuine dispute of material fact exists regarding the agreement's formation. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co*., 925 F.2d 1136, 1141 (9th Cir. 1991) ("Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co*., 636 F.2d 51 (3d Cir. 1980)). If, however, there is a genuine factual dispute regarding whether the parties formed an agreement, "the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved."

*Hansen*, 1 F.4th at 672. "The district court may decide the case in a bench trial if the party opposing arbitration does not demand a jury trial." *Id*. at 670 (quoting 9 U.S.C. § 4).

As an initial matter, the Court disagrees with Defendants' contention that there are "only two permissible outcomes under the FAA" when a contract formation is disputed: (1) grant the motion to compel or (2) proceed to trial. Dkt. 46 at 5. There is a third option—deny the motion and conclude as a matter of law that Aurandt did not enter into an arbitration agreement.[3]

Here, however, the Court cannot decide as a matter of law whether Aurandt consented to arbitration because there are genuine factual disputes about whether she completed the clickwrap agreement on Lendvia's website. Aurandt testifies under penalty of perjury that she never visited the website. Samuel compared her cell phone's screen resolution with that captured on the Verified Consent screen recording and determined that it was "materially inconsistent." Samuel Decl., Dkt. 35 at 9. Samuel also found no identifying "indicators of interaction with the site or related applications that would ordinarily be expected from genuine use." *Id.* He concluded that the "technical record as presented does not provide a reliable basis to conclude that [Aurandt] personally accessed the site or assented to the terms at the alleged time." *Id.*

---

[3] Defendants contend that Aurandt may not seek summary judgment on contract formation. Dkt. 46 at 2. Yet there is no dispute that Aurandt may oppose arbitration by arguing that the undisputed facts establish the absence of any agreement. The distinction is largely semantic. If no genuine dispute of material fact exists as to contract formation, the Court may resolve that issue as a matter of law.

ORDER - 14

Verified Consent's legitimacy is also in question. Verified Consent's email address appears not to work, it does not have a phone number, the company is not registered in the country where it lists its office address, there is no evidence of its corporate officers there, and the website has multiple broken links.

Defendants have also produced evidence to support the finding that Aurandt signed the agreement. They produced Verified Consent's screen recording of Aurandt purporting to sign the agreement, a certificate of authenticity containing detailed information about the user's interaction with the website, and Adhikary's sworn testimony describing how the record was created and confirming that it was a "true and accurate" copy made in the ordinary course of Verified Consent's business. Dkt. 28 at 5. The certificate largely matches Aurandt's information including her name, phone number, and social security. The information is also consistent with Aurandt's use of an Android device on the T-Mobile network. In addition, despite Aurandt's contention that evidence shows her cell phone was not used on January 12, 2025, this is not dispositive as Defendants point out that T-Mobile does not retain data sessions longer than three months. As a result, there is no evidence establishing that Aurandt did not visit the website.

Because there are genuine issues of material fact regarding the contract formation, the Defendants' renewed motions to compel arbitration and to stay discovery, Dkts. 37, 41, are **DENIED**. Aurandt's motion for partial summary judgment, Dkt. 34, is also **DENIED**. Because the parties did not request a jury trial, the arbitrability question will be resolved in a summary bench trial. The parties shall file a joint status report outlining

ORDER - 15

any additional discovery, a potential briefing schedule, and proposed dates for trial, within 14 days.

**IT IS SO ORDERED.**

Dated this 11th day of June, 2026.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 16